# IN THE COURT OF APPEALS OF IOWA

No. 24-0929
Filed April 9, 2025

IN RE THE MARRIAGE OF NICHOLAS JAMES WOOD
AND BRITTA NICOLE WOOD

Upon the Petition of
**NICHOLAS JAMES WOOD,**
Petitioner-Appellee,

And Concerning
**BRITTA NICOLE WOOD,**
Respondent-Appellant.

_____

Appeal from the Iowa District Court for Johnson County, Ian K. Thornhill, Judge.

A respondent appeals from the physical-care provision of a marriage dissolution decree. **AFFIRMED AND REMANDED WITH DIRECTIONS**.

Thomas J. Viner, Cedar Rapids, for appellant.

Tara L. Hofbauer, Andrew Howie, and Meredith Ludens of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellee.

Considered without oral argument by Greer, P.J., and Langholz and Sandy, JJ.

**LANGHOLZ, Judge.**

Britta and Nick Wood are both capable parents who love their five-year-old son. But their marriage is now dissolved. They live three hours apart. And they agree that their temporary joint-physical-care arrangement cannot continue. So the district court faced the difficult duty of choosing which parent would best serve their son's interests. Finding the choice closely balanced, the court ultimately placed their son in Nick's physical care because it found that he would be the most likely of the two to support their son's relationship with the other parent.

Britta appeals, arguing that we should make the contrary choice and place their son in her physical care. She contends that the court overlooked evidence weighing against Nick's ability to provide care, lacked any reliable basis to find that she would not support their son's relationship with Nick, and failed to explain its decision with sufficient detail and credibility findings to warrant any deference.

On our de novo review, giving the district court's well-reasoned and factually supported decision due deference, we agree that placing their son in Nick's physical care will best serve the son's interests. While we have considered the entire record and all the required factors in weighing this choice, like the district court we find that most factors leave the parents at a relative draw except for one. We agree with the court's assessment that their son's critical interest in having a relationship with *both* parents will be best served in Nick's physical care, especially given Britta's conduct showing an effort to alienate their son from Nick and his family while the dissolution was pending. We thus affirm the decree. And given the parties' abilities to pay and the merits of the appeal, we grant Nick's request for appellate attorney fees and remand for determination of a reasonable amount.

## I.    Background Facts and Proceedings

Nick and Britta met in 2012 in their hometown of Rockford, Illinois, while they were both on the coaching staff of a local high school football team.  They moved to Iowa City in 2016 for Nick to take a potential student assistant coaching position with the University of Iowa football team that ultimately did not pan out.  And in July 2017, they got married.  Britta was then working as a nurse at the university, and Nick was pursuing a degree while working part-time.

Eventually, Nick returned to coaching—first back in Rockford coaching high school football and then in Dubuque for a college team.  Britta continued as a nurse in Iowa City.  So they often only saw each other a few days a week.

In February 2020, Nick and Britta's son was born.  Nick continued commuting to Dubuque but soon began working from home because of the pandemic.  Nick's mother often came to Iowa City to help care for the son.  Britta also often took their son back to Rockford to visit her family.  On the whole, Britta provided more of their son's care when he was a baby than Nick did.

The marriage soon broke down.  We do not dwell on the specifics, but both parties presented evidence that each was verbally abusive to the other and the conflict occasionally rose to physical abuse.  In May 2021, Nick petitioned to dissolve their marriage.  And later in October, the district court[1] issued a temporary order placing their son in Britta's physical care with visitation for Nick on alternating weekends.  The order did not restrict the location of either parties' residence.

---

[1] This case was not assigned to the same district judge throughout the district court proceedings.  So neither this order nor the other pretrial orders were issued by the judge who ultimately heard the case at trial and issued the decree now on appeal.

Shortly after the temporary order, Britta moved with their son about three hours away to Rockford for a new job as a nurse practitioner. Like the district court, we find that the move "was not done out of spite or for the purpose of isolating the child" from Nick but rather to take "a professionally and financially beneficial opportunity" that was "closer to her hometown and family." Still—as the court insightfully observed—the move, the temporary order, and Britta's "penchant for wanting all things related to [their son] done her way[] created circumstances that led to her increasing alienation of [Nick] from [their son]."

Britta's conduct related to daycare for their son shows this alienation. To start, Britta enrolled their son in daycare in Rockford without involving Nick. She refused to tell him which daycare she selected. So he had to call around to many daycares to uncover the enrollment on his own. Britta also repeatedly refused to let Nick or his parents drop off or pick up their son from daycare. And for some time, Nick was not even allowed to visit the daycare to spend time with his son— despite its open-door policy for parents—because of the information Britta had provided the daycare. Nick's efforts to sort out why the daycare was preventing his contact resulted in what the daycare director described as "one of the most difficult phone calls [she] had with a parent" and an uncomfortable in-person meeting. And the daycare raised concerns it may have to remove their son if the conflict continued.

Britta eventually sought a temporary injunction prohibiting Nick from entering the daycare because she claimed he had "been behaving inappropriately" at the daycare. She also amended her answer to the petition to include a request for sole legal custody rather than joint legal custody as she had originally proposed.

The court denied the injunction without a hearing. The court found that she had failed to present sufficient evidence showing that Nick had acted inappropriately. It reasoned that there would be nothing inappropriate about Nick "[a]sking for information about the daycare and about his child's involvement with the daycare," "[c]hallenging the daycare staff if he is told he has no right to such information," or "[q]uestioning why he needs a letter from a lawyer to access information." The court also observed that the evidence "suggests" that Britta "attempted to restrict [Nick's] ability to obtain information about/from the daycare and to restrict whether [Nick] or others who are transporting for him can pick the child up from the daycare if that is where the child is located at the start of [Nick's] periods of visitation."

Soon after, Nick asked for the appointment of a custody evaluator because of the "extremely contentious custodial issues" in the case, including Britta's amended answer seeking sole legal custody. Nick agreed to be responsible for all fees for the evaluation. And over Britta's objection, the court granted the request, ordering Nick's proposed evaluator "to conduct a family forensic evaluation for the purpose of determining custody and child care arrangements that are in the best interests of the child."

The evaluator found no evidence that Nick interfered with their son's education and caregiving and noted that Nick "recognizes the importance of [Britta's] role as [their son's] mother and wishes to coparent on an equal basis." The evaluator also found that Britta had acted to restrict Nick and his family's access to the son and that Britta had a "tendency to minimize Nick['s] role and input into decision-making processes." And aside from these concerns, he found neither parent "was superior to the other" and both "demonstrated adequate

parenting knowledge and skills" and "are committed to providing [their son] with a happy and healthy childhood and family life." Recognizing that neither parent was open to moving closer so that they could "share equally" in care as would be ideal, the evaluator thus recommended placing their son in Nick's physical care.[2]

A week before the scheduled trial in March 2023, it was "cancelled due to lack of judicial resources to try the case on those dates." And when it was rescheduled, the next available trial date was over a year later—and nearly three years from the filing of the dissolution proceeding.[3] So Nick applied to modify the temporary order, arguing that given the recommendation of the custody evaluator, it was in their son's best interest to place the son in his physical care or "significantly expand his parenting time." After a hearing, the court modified the temporary order to award joint physical care with the parties alternating care weekly beginning in mid-July.

By the rescheduled April 2024 trial, Britta—then thirty-six-years old—was still working as a nurse practitioner in Rockford. Nick was thirty and working for a business in North Liberty. And the parties were still alternating physical care of their son weekly. Over three days, the court heard testimony from more than a

---

[2] The evaluator also noted that "the Iowa City area ranks significantly higher than Rockford" on "various quality of life indicators and rankings," and that Nick's extended family lived or was planning to move to Iowa City "before Britta relocated to Rockford."

[3] We appreciate the district court's transparency in its orders indicating that a "lack of judicial resources"—rather than any choices of the parties—caused the cancellation of trial. Unfortunately, the concerning trial delay here is not an isolated occurrence in this county. Nor is it consistent with our statewide trial scheduling time standards, which require a dissolution matter to be scheduled for trial within nine months unless a party shows good cause for exceeding them. *See* Iowa Ct. R. 23.2(1), (2). This case highlights the practical consequences to parties whose lives are left in limbo awaiting their day in court.

dozen witnesses—the parties, their family and friends, staff from the daycares attended by their son, the court-appointed custody evaluator, and an expert hired by Britta to critique the custody evaluation. The court also received more than two thousand pages of exhibits and more than fifty video or audio recordings.

In a thorough and well-reasoned decree, the district court placed the parties' son in Nick's physical care.[4] First, the court reasoned that "[b]oth parties love this child and can provide a healthy, safe, and loving home." It acknowledged that Britta had provided "the majority of physical care" to their son in "the early months of his life" and that Nick "received assistance from his mother" during "[m]any times when" he had care. But it focused on the ten months before trial when the parties had joint physical care and found "[b]oth parents have provided adequate care for the child" and that "neither has accomplished this without the assistance of others." Indeed, the court reiterated that both are "able physical and emotional caretakers of the child, and both have strong extended families willing and able to assist them in executing their duties as single parents."

Despite this balance, the court found "the scale ultimately tips in [Nick's] favor on the serious issue of which parent will better support the child's relationship with the other parent." The court based this conclusion on its findings that Nick "will sincerely and effectively undertake this responsibility" and that Britta's "conduct since the issuance of the original Temporary Order in October 2021 evinces an effort on her part to alienate [their son] from [Nick] and [Nick's] extended

---

[4] The court also resolved disputes about visitation, child support, and the assessment of the cost of the court-ordered evaluator and other court costs and approved the parties' stipulations on other financial provisions of the decree. None of these issues are before us on appeal.

family." Specifically, the court highlighted her conduct limiting Nick's "ability to have contact with and [be] informed regarding [their son] vis-a-vie the daycare." And while acknowledging some issues with the "methodology and initial assumptions" of the court-ordered custody evaluation, the court agreed "in general" with the evaluator's "conclusions that in the year and a half that [Britta] exercised temporary primary care of [their son], she interfered with, rather than promoted, [Nick's] relationship with the child" and the evaluator's observation that "if [Britta] is given power and authority over [their son] greater than that of [Nick], she exercises that power in a way that negatively impacts the relationship between [their son] and [Nick] and his extended family." Britta now appeals.

## II.    Physical Care

We review the district court's decision on physical-care placement de novo. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). But a district court is "greatly helped in making a wise decision about the parties by listening to them and watching them in person," while we are limited to the cold, printed record before us and thus "denied the impression created by the demeanor of each and every witness." *In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (cleaned up). So we give weight to a district court's fact findings—especially those based on credibility determinations—even though they are not binding on us. *See id.*; Iowa R. App. P. 6.904(3)(g).

"When considering the issue of physical care, the child's best interest is the overriding consideration." *Fennelly*, 737 N.W.2d at 101. The factors in Iowa Code section 598.41(3) (2021) and those articulated by the supreme court *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974), guide us. *See id.* Our goal "is to

place the child[] in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). And "[p]hysical care issues are not to be resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*." *Id.*

Weighing these factors, we agree with the district court that placing the parties' son in Nick's care is in their son's best interest. The ten months of their son's growth and development while in their joint physical care shows that either parent is capable of providing a positive home environment. And like the district court, we find that the choice between the two parents is closely balanced except for one factor—Britta's conduct while this proceeding has been pending shows that she is less likely to support their son's relationship with Nick if he is placed in her physical care. *See* Iowa Code § 598.41(3)(e) (requiring consideration of "[w]hether each parent can support the other parent's relationship with the child").

Britta highlights conduct and statements by Nick that she contends show he is a less fit parent. She also points out his more limited experience caring for their son before the temporary order was modified to joint physical care. And she argues that the district court did not consider this evidence when it focused on what it found to be the critical dispositive factor. We disagree.

The district court provided a well-reasoned, factually supported, and concise explanation of the reasons for its physical-care decision. That the court chose not to itemize every piece of evidence considered does not mean that the court failed to consider it—especially given the voluminous record here after a three-day trial with more than a dozen witnesses, thousands of pages of exhibits,

and gigabytes of videos. All the more so here, where the court found that the parties' suitability as caregivers was not really at issue as both are "able physical and emotional caretakers of the child" and had shown that most clearly during the ten months of joint physical care. What's more, the court did expressly recognize that Britta had provided a majority of the care during the early months of their son's life and that Nick often had help from his mother (as did Britta). It just weighed the more recent period of alternating weekly joint physical care more heavily than earlier periods or the other potential concerns raised by Britta. So do we.

Britta also argues the court should not have rested its decision on a finding that she had alienated Nick from their son and would be less likely to support their son's relationship with Nick. But this aspect of the court's decision is also well supported. Selecting a placement that will best foster the son's relationships with both parents is a critical factor. *See* Iowa Code § 598.41(3)(e). So too is one parent's effort to alienate the other. *See id.* § 598.41(1)(c) ("The court shall consider the denial by one parent of the child's opportunity for maximum continuing contact with the other parent, without just cause, a significant factor in determining the proper custody arrangement."); *In re Marriage of Quirk-Edwards*, 509 N.W.2d 476, 480 (Iowa 1993) (holding that a parent's limiting of a child's contact with the other parent is a compelling reason to place the child with the other parent that may even override countervailing interests).

We, like the district court, do not hold Britta's move to Rockford against her. But there is ample evidence that her actions beyond the mere move improperly limited Nick's contact with their son, especially relating to daycare. While this finding is in line with the conclusions of the court-appointed custody evaluation, we

too reach it based on the other testimonial and documentary evidence presented at trial rather than merely accepting the evaluator's opinion.

The court's finding that Nick will more likely support Britta's relationship with their son than vice versa is also supported by the parties' positions in this case. Although by the time of trial Britta agreed that the parties should have joint legal custody, for a time she was seeking sole legal custody and expressed concern to the evaluator that Nick would otherwise interfere with their son's routines and placements. In contrast, Nick has consistently acknowledged the important role of Britta in their son's life, explaining at trial that he thought seeking sole legal custody was "not in [their son's] best interest" because "[r]egardless of the pain and the struggles [and] lack of time, [his] love for [their son] will always come above that." Indeed, he even requested joint physical care if the parties would ever move within twenty miles of each other. And we are mindful that the court's assessment of the parties' sincerity on this point was aided by its "front-row seat" to three days of trial. *Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024).

We thus affirm the district court's physical-care decision. We do so because the placement is in the best interest of the parties' son—not as a reward or punishment for either party's conduct. And we echo the district court's comments at the end of trial that the parties and their families need to remember that they are "forever connected through this child" and while they "don't have to like each other," they "have to make an effort to be civil and do what's in the best interest of [their] child." Their son needs strong relationships with both parents despite the geographic and emotional distance between each parent. And it will take a concerted effort from both parents to make that a reality.

### III.    Appellate Attorney Fees

Nick asks for an award of appellate attorney fees.  We have discretion whether to award appellate attorney fees in an appeal of a dissolution decree.  *See In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013).  In exercising that discretion, "we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."  *Id.* (cleaned up).  Here, Britta makes nearly three times as much as Nick, who was forced to defend against her unsuccessful appeal.  We thus grant Nick's request for appellate fees.

Although Nick requested appellate fees in his brief and said he would "file an attorney fee affidavit upon submission of this case," he unfortunately did not do so.  Indeed, "we prefer that parties requesting appellate fees do so in their briefs and submit an attorney-fee affidavit immediately after oral argument or after the case is submitted without oral argument" so that we can decide the amount of the award.  *In re Marriage of Samuels da Fonseca Silva*, 15 N.W.3d 801, 808 (Iowa Ct. App. 2024).  But since we do not have an attorney-fee affidavit, we remand to the district court with directions to decide the reasonable amount of appellate attorney fees to award.  *See id.*

**AFFIRMED AND REMANDED WITH DIRECTIONS.**